# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-CP-00256-COA

**BETTY M. SULLIVAN**                                                          **APPELLANT**

**v.**

**BOBBY D. SULLIVAN**                                                          **APPELLEE**

DATE OF JUDGMENT:              02/03/2025
TRIAL JUDGE:                  HON. TAMETRICE E. HODGES
COURT FROM WHICH APPEALED:    HINDS COUNTY CHANCERY COURT,
                              FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:       BETTY M. SULLIVAN (PRO SE)
ATTORNEY FOR APPELLEE:        BOBBY D. SULLIVAN (PRO SE)
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                              REMANDED IN PART - 06/02/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND WEDDLE, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1.     Betty M. Sullivan appeals from the Hinds County Chancery Court's order denying her motion to reconsider the property distribution in the judgment of divorce the court had entered. After withdrawing their fault grounds and agreeing to proceed with the divorce on ground of irreconcilable differences, the parties submitted to the court the primary issue of the division of their marital property, which the court tried and adjudicated. Betty moved the court to reconsider several issues. The court partially granted and partially denied her motion. Betty appeals and challenges the court's treatment of her life insurance policy, the cash payout the court required her to pay to Bobby, the valuation of the parties' estates, and the overall division of the marital assets. Bobby has not responded to the appeal, but we

nonetheless consider the merit of each of Betty's arguments. After consideration of her arguments and a review of the record and relevant precedent, we affirm the judgment in part, and we reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

¶2. Betty and Bobby Sullivan married on June 4, 1983. The couple had two children, who were grown when the parties separated on February 2, 2019. On March 11, 2019, Betty filed a complaint for divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences in the Hinds County Chancery Court. On the same day, Betty filed a "Petition for Emergency Temporary Restraining Order without Notice" against her husband Bobby. On March 18, 2019, the court entered a restraining order and granted Betty temporary access to the marital home to retrieve necessary personal items.

¶3. In addition to filing an answer and defenses to Betty's complaint, Bobby filed a counterclaim for divorce on the ground of habitual cruel and inhuman treatment. On the day of trial, April 3, 2024, the parties withdrew the fault-based grounds in their pleadings and agreed to a divorce on the ground of irreconcilable differences. The chancery court had only to determine the issue of equitable division of the parties' property, which included the marital home, various rental properties, vehicles, retirement and savings accounts, and life insurance policies.[1] At trial, both Betty and Bobby testified and entered several exhibits for the court's review, including their Rule 8.05 financial statements required by the Uniform

---

[1] During the trial, the parties announced to the court that they had amicably divided the personal property and furnishings in the marital home, and the court did not need to address these items.

Chancery Court Rules that they had prepared and filed in February 2024.

*Employment and Income*

¶4. The parties testified that during the marriage, Betty worked in accounting, finance, and personnel for the Mississippi Gaming Commission and the Department of Human Services. In 2008, Betty began to work for the Federal Deposit Insurance Corporation (FDIC), where she was employed at the time of trial, earning approximately $199,000 per year. Bobby worked as a medical technologist for the Veterans Affairs Medical Center for over thirty-one years until he retired in 2016. After a few years off, Bobby returned to work briefly at Merit Health, and at the time of these proceedings, he was employed part-time by Methodist Rehabilitation. At the time of trial, according to his Rule 8.05 financial statement, Bobby had gross employment income of $6,048 per month, a monthly pension of $1,974, and income from rental properties of $3,500.[2]

¶5. The couple maintained separate personal bank accounts. According to Betty, the money from rental properties they owned was placed in either a business checking or savings account, and from those accounts, the mortgages, including the mortgage on the marital home, were automatically deducted. Betty testified that in 2014, Bobby closed all the business accounts they had and transferred the remaining $11,000 into his personal account. He paid the home mortgage as well as the expenses on the rental properties from that account. Out of her separate bank account, Betty purchased furnishings for the home, often taking out loans to do so. She also purchased food for the family, clothing for the children,

---

[2] During their marriage, they both also returned to school and obtained master's degrees.

3

and paid some of the utilities until 2014. Thereafter, Bobby paid all the utilities. Betty also paid for one of their children's college education through the Mississippi Impact Program over the years; the other son still had student loans he (the son) was paying. Betty said she gave both the boys allowances and paid for their other college expenses. Bobby testified, and his Rule 8.05 financial statement reflected, that he collected and kept all the payments from the jointly owned rental properties, from which he realized an additional $3,500 per month of income.

*Marital Home*

¶6.    Their testimony also established that the first marital home that Betty and Bobby purchased together was located on Queen Eleanor Lane in Jackson, Mississippi, where they resided for a period of time and raised their sons. Later, they moved to Country Wood Drive in Jackson, while retaining ownership of the property on Queen Eleanor Lane. They also acquired numerous other rental properties during the marriage that will be discussed further below. When the parties separated, Betty left the marital home and began residing at a home on Autumn Woods Drive in Jackson, a property she had personally purchased in 2018.

*Rental Properties*

¶7.    In addition to their employment, early in their marriage, Bobby and Betty began purchasing rental properties, which generated significant income. Both became licensed real estate brokers.[3] They managed the properties together, and by 2015 they had acquired numerous  rental properties, titled either in Bobby's or Betty's name, or both.

---

[3] In 1997, Bobby formed Sullivan Realty Inc., and in 2016, Betty formed her own realty company, Blackhawk Realty.

¶8.     On November 24, 2015, Betty quitclaimed her interest in several rental properties to Bobby.[4] Bobby testified that he was not aware that Betty had deeded these properties to him until he saw a letter from the clerk's office returning the deeds after they were recorded. Bobby said he confronted Betty about it, but she did not respond. Bobby believed that Betty executed the deeds as a "form of manipulation," perhaps in anticipation of divorce. Betty, however, testified that after 2014, Bobby decided he no longer wanted her to have anything to do with the properties. She said he refused to listen to her when she made suggestions even though she was a co-borrower on all the mortgages for the properties. She said her initial role was to make sure that the bills were paid on the properties and the income deposited in the rental properties' account. But, Betty stated, Bobby was not maintaining the properties "almost to the point of embarrassment," and she did not want to be associated with them. So she quitclaimed her interest in them to Bobby.

¶9.     After 2015, the parties continued to jointly hold seven other properties, including other rental properties, two vacant lots, and the marital home in Jackson, as well as a timeshare in Florida.[5] The parties disagreed on the values of these properties, and the court instructed their attorneys to secure the land roll information about them that was placed into evidence. The parties stipulated to the values reflected in the land rolls, and the court stated

_____

[4] These properties were located in Jackson at six different locations. One house, on Liberty Street, had burned thirteen years before, and Bobby and Betty collected insurance on the loss.

[5] They purchased the timeshare in 2007 for $12,000, which they paid off in seven years with monthly payments of $167 per month. Bobby stated that he made all these payments. The timeshare entitled them to stay in a condo for one week of the year. They could rent that week out for $1,000 to $2,000.

it would use those in its valuation of the properties. Bobby asked the court to award him these properties; Betty said she wanted the house on Queen Eleanor Lane because it was their first home, and she wanted to fix it up for their children to use. She asked the court to order the others be sold because they were deteriorating, and if they were vacant too long, she claimed they could be lost due to outstanding unpaid mortgage payments. If the houses sold for a profit, Betty wanted half, but she wanted Bobby to absorb any loss.

¶10. There were three other properties titled solely in Betty's name. She acquired the one on Autumn Woods Drive during the marriage in July 2018.[6] She acquired two others after the parties separated: she purchased property on Old Orchard Place in Jackson in August 2022 and a house on Katie Kerr Drive in Decatur, Georgia, in January 2021. She testified that she purchased the Georgia home with money she had earned through Blackhawk Realty, which she had put into an investment account for the purchase of these properties.

*Properties Sold*

¶11. Bobby testified that in 2022, after the separation, he sold a vacant lot that he had bought (the date of purchase does not appear in the record) on Nimitz Street in Jackson. He sold it for $1,500, and he did not share any of that money with Betty. Bobby also testified that Betty bought a property on Waxwing Drive without his knowledge during the marriage and sold it "about four years ago" before she filed the divorce complaint. Betty stated that in 2013, she purchased a property on her own, using her employment income, and later sold

---

[6] Betty lived in the Autumn Woods property approximately two weeks per month, and she leased an apartment in Maryland, where she stayed the rest of the month to be close to her work for the FDIC in Arlington, Virginia.

it in 2016 for $95,000.  She stated that half of that amount went to pay off the mortgage she had obtained to purchase the property.  She said that she did not give Bobby any of the remainder.

*Bobby's Gambling*

¶12.    Betty contended that Bobby had a significant gambling problem.  She said that in the earlier years of their marriage, he was not using the rental income to maintain the properties, but to gamble.  Betty testified that in the 1990s, Bobby ran up credit card debt to $60,000 due to his gambling.  While Bobby admitted to having a gambling "hobby" and frequenting casinos as often as every weekend, he denied spending the amounts listed in one casino's records obtained through subpoena.[7]  Betty testified that Bobby's gambling "hobby" did the most damage to their finances during the 1990s when the couple had to refinance their rental properties multiple times to pay off about $60,000 in credit card debt that Bobby had accrued from gambling.  She further testified that they were not able to put their children in better educational environments because of his gambling losses, although both children did obtain a college education.  Moreover, his gambling impacted the rental properties that were in subpar condition at the time of trial and would not command market value if sold.  Bobby even admitted that several were vacant and needed repairs.

*Vehicles*

¶13.    Both parties owned vehicles.  Bobby testified that he owned a 2017 Mercedes SUV,

---

[7]    The certain casino records for 2016 and 2017 show that Bobby only bet about $12,000 over those two years, and lost about $3,800.  However, after the parties separated, Bobby's gambling increased.  In 2022 alone, those records showed, and Bobby admitted, that he gambled $156,221.70 and only won $128,743.37, losing $27,478.33.

which he valued at $30,000, but he still owed $14,000 on it. On his Rule 8.05 financial statement, he reported that he owed $12,000 on the vehicle, and he had equity of $9,000. He also testified that he had a 2005 Mercedes E320 that he valued at $10,000 that was paid for. This amount differed from the $8,500 value he reported on his Rule 8.05 statement. Bobby further testified that he outright owned a 2005 Chevrolet Silverado worth $4,000. He did not list this vehicle on his Rule 8.05 statement.

¶14. Betty's testimony about the value and amounts owed on the four vehicles she had was consistent with her Rule 8.05 financial statement: a 2005 Lexus worth $2,000, a 2007 Mercedes-Benz worth $4,500, and a 2009 Acura worth $6,500, all of which were paid for in full, and a 2024 Mercedes-Benz, which was clearly purchased just before trial at a cost of $86,249.

*Retirement Accounts*

¶15. Bobby testified that he had no retirement accounts, no 401(k), and no IRA. However, he does report $1,974 in monthly retirement pay from the Veterans Administration. At one point, he had a Thrift Savings Plan (TSP) when he worked at the VA. When he retired in 2016, he cashed out the TSP. He stated that he used some of the money to help purchase his Mercedes SUV, and he used the rest to pay on the mortgages of the marital home and rental properties, as well as household bills. He went back to work in 2018 part-time, and at the time of trial, he was enrolled in a retirement plan with UMC that had accumulated approximately $15,000.

¶16. Betty had listed several retirement accounts on her Rule 8.05 financial statement. She

8

prepared the statement in February 2024, using current values in the accounts that totaled $295,497. At trial, she verified those current values, but she was not asked when the accounts were established or what value they had as of February 2, 2019, the date of demarcation later set by the court.

*Life Insurance*

¶17.    During the marriage Bobby and Betty had several life insurance policies. Bobby had a whole life insurance policy that covered him for $120,000 and covered Betty for $110,000. In his Rule 8.05 financial statement that he completed prior to the hearing, Bobby reported that the policy had a cash value of $30,000. However, at the trial, Bobby testified that he had just estimated that figure on the Rule 8.05 statement and that the cash value was actually $17,000. Betty asked that this policy be cashed in and that she be awarded fifty percent of the value or, if the policy coverage could be divided, that he maintain his portion and she maintain hers.

¶18.    Betty testified that she had two term life insurance policies: one with TruStage with coverage of $100,000, and another through her employer, with Federal Employees' Group Life Insurance (FEGLI), which had coverage on Betty of $190,000. However, Betty incorrectly listed both policies on her Rule 8.05 financial statement as having a cash value of $290,000 combined. At trial, she corrected this information, telling the court that they were term policies that had no cash value.

*Final Judgment*

¶19.    On June 4, 2024, the chancery court issued a judgment granting the divorce and

9

dividing their marital assets and debts. The court set the beginning date to determine marital property as the date of the marriage, June 4, 1983, and the ending date—the date of demarcation—to be the date of separation, February 2, 2019.

¶20. The court listed the properties that each party claimed as jointly owned and listed their financial assets, taken largely from the Rule 8.05 financial statements that the parties had provided in February 2024. The court determined that both Betty's and Bobby's life insurance policies had cash value. The court found that Bobby's estate consisted of jointly owned properties, vehicles, checking and savings accounts, and life insurance policy with a cash value (which the court found to be $17,000) and had a total value of $593,537.30, not counting liabilities. The court valued Betty's estate, not counting liabilities, at $2,050,616. However, included in this was the court's determination that her life insurance policy had a cash value of $290,000, as well as $705,000 in property value of two properties Betty purchased after the date of demarcation, which the court agreed were non-marital but included them anyway in the property division.

¶21. The court then considered each of the *Ferguson* factors,[8] reviewing testimony it found persuasive, and concluded whether that factor favored Bobby or Betty. Concerning the factor relating to the contributions to the stability and harmony of the marital and family relationships, the court determined that Bobby's gambling was casual and not habitual, that even if the mortgage on the rental properties fell behind, Bobby brought it current, and that the boys did well in school and were able to attend college. The court found that this factor

---

[8] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

favored both parties because Betty's allegations that Bobby's gambling had adversely affected the family were overcome.

¶22. After addressing each factor, and finding whether it favored Betty or Bobby, the court divided the assets, giving all rental properties and the marital home to Bobby, including the Nimitz Street lot that Bobby had sold after the separation. Despite noting the parties disputed the values of these properties, the court chose Bobby's valuations instead of the landroll amounts as the court had indicated during the trial it would use. The court valued Bobby's share of the value of the real property at $541,300. The court awarded Betty the timeshare, the Autumn Woods property she was living in, and the two properties she had purchased after the demarcation date, valued at $705,000. The court valued Betty's total share of the real property at $829,000.

¶23. The court further ordered Betty to pay Bobby $12,000 for the timeshare, and further ordered her to pay him $125,000 for his portion of her savings. The court awarded to each party the vehicles and life insurance policies they held but ordered that neither could be the beneficiary of the insurance policies. Each party was responsible for their own debts and attorney's fees.

*Motion to Reconsider*

¶24. Betty hired new counsel, and on June 24, 2024, she filed a motion for reconsideration of the court's judgment of divorce and raised several errors of both law and fact. She argued that the court had erred in several ways, including:

    (1)    <u>Finding that Betty's term life insurance policies had cash value</u>.

11

¶25.    In its judgment, the court had determined that Bobby's life insurance had a cash value of $17,000, when Bobby had reported on his Rule 8.05 financial statement that the value was $30,000.  The court had also determined that Betty's life insurance policies had a cash value of $290,000 although Betty had testified that she had erred in putting that figure in her Rule 8.05 financial statement and had stated, under oath, that they were term policies with no cash value.  To support this testimony, Betty attached to her motion a "FEGLI Life Insurance Policy" manual and a "TruStage/AD&D" policy coverage sheet, both of which specifically stated that the policies had no cash value.  Consideration of these would reduce the value of Betty's estate by $290,000.

(2)     Erroneously valuing Betty's savings and retirement accounts.

¶26.    In the judgment, the court had adopted the parties' Rule 8.05 financial statement information, including the balances of a variety of Betty's savings, retirement, and annuity accounts.  However, those amounts reflected the balances as of February 2024 when the financial statements were filed; they did not reflect the balances in those accounts on the date of demarcation, February 2019.  Betty attached to her motion statements from several banks and companies showing the values in those accounts as of February 2019.  Using the correct information, Betty's savings and investments and overall estate would be significantly reduced.  For example, at the time of trial, the Vanguard IRA had a balance of $102,227, but on the date of demarcation, the account contained only $24,278.71, and a Cadence Certificate of Deposit (CD), which at the time of trial was valued at $35,606, had a value of $651.26 on the date of demarcation.  Moreover, a Chase Bank account that was valued at the time of trial

12

at $23,099 was only opened in July 2021. Betty attached numerous documents to support these facts.

(3)     Including non-marital property purchased after the date of demarcation.

¶27.   Betty pointed out that the court erroneously included the properties and the Mercedes she purchased after the date of demarcation and distributed them as if they were marital property.

(4)     Erroneously finding that Bobby had no retirement income.

¶28.   In the judgment of divorce, the court found that Bobby had no retirement income available to him. However, he had a Federal Employee Retirement System (FERS) account that he did not report to the court; even on his Rule 8.05 statement, he noted he had retirement income of $1,974 each month.

(5)     Failing to value and divide Blackhawk Realty and Sullivan Realty.

¶29.   Betty argued that if the court included the property she bought after the date of demarcation as marital property, then Blackhawk Realty, the company that she bought them through, should also be valued and distributed to her. Along with the property, Blackhawk owned checking and savings accounts at four different institutions at the time of trial. However, the Chase Bank account was not opened until after the date of demarcation, and the balance in the Morgan Stanley business account was higher at trial than it was on the date of demarcation.

¶30.   Concerning Sullivan Realty, Betty argued that Bobby owned and operated that business, which the court found was dissolved after the date of demarcation. However, the

court never valued the business as of the date of demarcation.

(6)     Erroneously valuing three of the rental properties.

¶31.    Betty pointed out that the values placed on three of the rental properties did not take into consideration the debt that was still owed on the properties.

(7)     Erroneously valuing the marital furnishings.

¶32.    Betty argued that the court ordered the parties to "split the marital furnishings" but did not determine a value. On their Rule 8.05 statements, Betty had valued the furnishings at $35,000, and Bobby had valued them at $60,000.

*Order on Motion for Reconsideration*

¶33.    On November 11, 2024, the chancery court heard arguments on Betty's motion for reconsideration. Bobby did not file a formal response to the motion and appeared at the hearing without counsel. On February 3, 2025, the court entered its order partially granting and partially denying Betty's motion.

¶34.    Concerning the cash value of Betty's life insurance policies, the court stated that the evidence attached to the motion was not provided at trial and was not newly discovered evidence. Further, the court stated that Betty testified that she wanted 50% of the cash value if it could be liquidated, which was inconsistent. Thus, the court denied relief on this issue. Concerning Blackhawk Realty, the court clarified that it was ruling Blackhawk was Betty's separate property and granted Betty's motion on this issue. Accordingly, the court removed the value of Blackhawk's assets in its revised distribution. Concerning the division of marital furnishings, the court granted the motion in part and denied the motion in part,

14

averaging the values that Bobby and Betty each placed on household furnishings for a revised value of $52,850 of the household items.[9]  Concerning the value of jointly owned rental properties, the court amended the values of the properties to include the debts owed, valuing them at $546,300, the average of Bobby's values ($558,300) and Betty's values ($494,300).

¶35.    The court then determined that the equity of the rental properties (i.e., the fair market value) that Bobby was awarded totaled $88,796.  The court determined Betty was entitled to half of that equity ($44,398) and decreased the amount Betty had been ordered to pay Bobby as his share of her savings by $44,398.  The court ordered Betty to pay Bobby $80,602 within ninety days.

*Appeal*

¶36.    On March 3, 2025, Betty appealed the judgment of divorce and the order on her motion for reconsideration.  On appeal, she argues (1) that the court erroneously attributed cash value to her term life insurance policies, (2) that the court erroneously awarded Bobby a cash payment of $80,602 and $12,000 for the timeshare, (3) that the court erroneously denied her any equitable interest in the mortgage-free marital home, (4) that the court erroneously double-counted the values of rental properties she had quitclaimed to Bobby in the valuation of the marital estate, and (5) that the court's distribution of the marital property was unjustified and inequitable.

---

[9]  Bobby valued the home furnishings at $60,000; Betty valued them at $35,000 plus $10,700 for jewelry, a personal computer, and guns.  Neither gave a detailed itemization of how they arrived at these figures.  Moreover, during the trial, the parties announced that they had divided up the furnishings and that the court did not have to do it.

**Standard of Review**

¶37.    Bobby did not file an appellee's brief, but that does not necessarily require a reversal of the chancery court's judgment.  In *Rogillio v. Rogillio*, 101 So. 3d 150, 153 (¶12) (Miss. 2012), the Mississippi Supreme Court noted the options we have when an appellee fails to file a responsive brief:

> [F]ailure of an appellee to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of [the] appealing party, that there was no error.  Automatic reversal is not required where the appellee fails to file a brief.  However, the appellant's argument should at least create enough doubt in the judiciousness of the trial court's judgment that this Court cannot say with confidence that the case should be affirmed.

This Court followed the Supreme Court's direction in *Fox v. Fox*, 223 So. 3d 192, 193 (¶2) (Miss. Ct. App. 2017), and reversed a trial court's finding of contempt when the appellant raised a meritorious argument and the appellee had failed to file a brief.  *Id.* at 194 (¶¶7-8).

¶38.    "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review."  *Leblanc v. Leblanc*, 271 So. 3d 494, 502 (¶36) (Miss. Ct. App. 2018) (citing *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003)).  "The findings of a chancellor in domestic relations matters will not be disturbed [on appeal] unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied."  *O'Neal v. O'Neal*, 17 So. 3d 572, 574 (¶11) (Miss. 2009).  On appeal, "this Court reviews the chancellor's equitable division of the parties' marital estate under the familiar manifest-error standard of review."  *Mosher v. Mosher*, 192 So. 3d 1118, 1124 (¶22) (Miss. Ct. App. 2016) (citing *Anderson v. Anderson*, 174 So. 3d 925, 929 (¶8) (Miss. Ct. App.

16

2015)).

## Discussion

**I.  Whether the chancery court erroneously attributed cash value to Betty's term life insurance policies.**

¶39.  The chancery court determined that Betty's $190,000 and $100,000 life insurance policies were a part of the marital estate and had cash values, despite Betty's testimony at trial that she had mistakenly listed them as cash-value policies on her Rule 8.05 financial statement.  After the chancery court held that the policies had cash value, Betty moved for reconsideration and attached documents to prove that the policies had no cash value.  The court refused to reconsider its finding, and Betty raises this as her first issue on appeal.

¶40.  Marital property consists of any and all property acquired or accumulated during the marriage.  *Doe v. Doe*, 341 So. 3d 953, 971 (¶55) (Miss. Ct. App. 2021).  This includes cash value life insurance policies if the parties paid the premiums using marital funds.  *Id*. at 971-72 (¶56); *see also Traxler v. Traxler*, 730 So. 2d 1098, 1100 (¶39) (Miss. 1998) (remanding for a determination of what accounts premiums on a $26,500 cash value policy were paid).

¶41.  In the case at hand, the dispute is not whether marital funds were used to pay the premiums on Betty's two term life insurance policies.  There is no dispute that both Betty and Bobby's policies were purchased using marital funds.  What is in dispute is whether Betty's policies had cash value such that they would to be included in the marital estate.  Further at issue is whether the chancery court erred in rejecting the evidence Betty presented in her motion to reconsider that supported her trial testimony that these policies had no cash value.

¶42.  "We review a chancellor's denial of post-trial motions filed pursuant to Rule 60(b)

17

and Rule 59 for an abuse of discretion." *Johnson v. Smith*, 328 So. 3d 145, 150 (¶21) (Miss. Ct. App. 2021). "We will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous[,] or applied an erroneous legal standard." *Gussio v. Gussio*, 371 So. 3d 734, 745 (¶20) (Miss. Ct. App. 2023) (quoting *Briggs v. Hughes*, 316 So. 3d 193, 198 (¶20) (Miss. 2021)).

¶43. "A motion for reconsideration is treated as a motion to amend the judgment pursuant to Rule 59(e) of the Mississippi Rules of Civil Procedure[.]" *White v. Brown*, 301 So. 3d 750, 759 n.3 (Miss. Ct. App. 2020) (citing *Harris v. Harris*, 167 So. 3d 1254, 1257 (¶11) (Miss. Ct. App. 2014)). We recognize that "to succeed on a Rule 59(e) motion, 'the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice.'" *Id*.

> In *Bruce* [v. *Bruce*, 587 So. 2d 898 (Miss. 1991)], the supreme court recognized that "[w]hen hearing a motion under Rule 59(e), a trial court proceeds de novo, if not ab initio." *Id*. at 904. As the supreme court explained, "[r]ecognizing that to err is human, Rule 59(e) provides the trial court the proverbial chance to correct its own error to the end that we may pretermit the occasion for a less than divine appellate reaction." *Id*.
>
> We find that this reference to the trial court proceeding "de novo" describes the fresh look the trial court employs in reviewing the record when considering the movant's Rule 59(e) arguments—i.e., whether the movant has shown a "need to correct a clear error of law or to prevent manifest injustice."

*Roley v. Roley*, 329 So. 3d 473, 498 (¶¶71-72) (Miss. Ct. App. 2021).

¶44. Here, Betty listed her two policies on her Rule 8.05 financial statement, one she held

through her employer, a Federal Employees' Group Life Insurance (FEGLI) policy with $190,000 coverage, and the other, an accidental death and dismemberment policy she held with TruStage GMFG Life Insurance Company with $100,000 coverage. She also listed them as having cash value of $190,000 and $100,000 each. At trial, however, she testified that she had made an error on her financial statement and that the policies had no cash surrender value and were merely term life policies. Bobby did not object nor dispute this testimony. Yet in its judgment, the chancery court held that the policies had cash value.

¶45. Betty moved for reconsideration and attached the coverage page of the TruStage policy, which specifically states, "This policy does not earn cash value." She also attached the FEGLI policy handbook, which at page 6 clearly stated, "FEGLI is a group term life insurance. It does not build up cash value." In its order on the motion to reconsider, the court rejected this evidence, stating that these documents were not presented at trial or newly discovered and that Betty had testified inconsistently at trial about whether the policies had cash value.

¶46. Based on the record before us, we find that Betty's argument not only creates enough doubt on the judiciousness of the chancery court's decision on this issue that we cannot affirm, but her argument leads us to conclude that the chancery court abused its discretion in failing to correct a clear error of fact concerning the cash value of Betty's policies.

### A. Consideration of Evidence under Rule 59

¶47. Rule 59(a) of the Mississippi Rules of Civil Procedure provides in part:

> On a motion for a new trial in an action without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings

19

of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

The Rule specifically envisions that the trial court may consider new evidence, even after trial on a matter, when submitted in motion for reconsideration. Although the documents Betty attached were not "newly discovered," at trial Bobby did not dispute her testimony that the policies had no cash value and made no demand that further proof be produced. The court gave no indication during the trial that it did not believe Betty or that the court required more evidence than her sworn testimony. We note that Bobby testified at trial that he, too, had made a mistake on his Rule 8.05 financial statement where he reported his policy had a cash value of $30,000. He corrected his error and presented nothing more than his sworn testimony that the policy had only $17,000 cash value. The court inequitably required more of Betty than Bobby, yet the court would not reconsider its finding when Betty provided documentary evidence in her motion to reconsider.

¶48. The documents indisputably established that both policies had no cash value, and the court failed to correct a clear error it had made in considering the policies as cash-value policies. When presented these documents, the court needed to cure the manifest injustice that was created when the court included the sizeable amounts of the policies ($290,000) in the marital estate subject to division.

### B. Inconsistent Testimony

¶49. In addition, we find no inconsistency in Betty's testimony at trial concerning the nature of her life insurance policies. When shown her Rule 8.05 financial statement, she was asked by her counsel:

Q. Okay. If you go to page 9, you list at the top two life insurance policies; correct?

A. Correct.

Q. So you indicate that they have a face amount the first with TruStage of 100,000, and then the second FEGLI life insurance of 190,000. Do you see that?

A. Yes.

Q. That's the face amount of the policies; correct?

A. Yes.

Q. Does that mean that the amount that would be paid out to the beneficiaries upon the death of the owner?

A. Yes.

Q. Ms. Sullivan, are you sure that those life insurance policies collectively have a cash value of $290,000 meaning that today you could cash those in for that amount?

A.  No. These are term life policies and they have no cash surrender value.

Q. Okay. So I'm going to represent to you, and I'm sure Ms. Jones and the Court will correct me if I'm wrong, but it's my understanding that term life insurance policies have no cash value. Do you disagree with that?

A. No, I do not.

Q. Okay. So you're not suggesting that these policies have any value; right?

A. Correct.

The court may have been confused when Betty was asked about Bobby's life insurance policies, where she requested a 50% share if he cashed in his policy:

Q. Okay. Now Mr. Sullivan on his 8.05 Financial Statement did list two life insurance policies. And you heard his testimony today that he believes that those policies did have a collective cash value of $17,000, do you recall that?

A. Yes, I do.

Q. Okay. And what, if anything, are you asking the Court to do relating to that $17,000 cash value on the two Allstate whole life policies?

A. If the cash value can be -- if it can be distributed, I would like to request the Court to award me 50 percent of that cash value, and I would like to terminate that whole life policy and use those funds toward a long-term care policy with the establishment of a long-term care policy or a disability policy or both.

21

Q. Okay. So if the cash value can be liquidated, you want half of it; is that right?

A. That is correct.

Q. If it cannot be liquidated, what do you want?

A. If cannot be liquidated, then I would consider possibly keeping the policy if the policy can be divided, and I'm not really sure. I'm not -- matter of fact, I had forgotten all about the whole life policy. We started that policy in our early 20s, and I didn't realize he had even maintained it as long as he had. But if it can be and then I can maintain mine, then I'd be willing to do that.

The chancery court was clearly wrong when it stated that Betty inconsistently testified her policies had no cash value and then asked for fifty percent of the value if they could be liquidated. Betty was speaking about Bobby's policies, not hers.

¶50. In summary, we hold that Betty's arguments not only create enough doubt in the judiciousness of the chancery court's decision on this issue that we cannot affirm it, but they also lead us to conclude that the chancery court abused its discretion and erred in failing to reconsider its finding on the value of Betty's life insurance policies. Although Betty's policies were purchased with marital funds, Betty sufficiently proved that the policies had no cash value, both by her sworn testimony at trial and by documents produced in her motion to reconsider.[10] Accordingly, because the court erroneously included these amounts in its valuation of the parties' estates, either marital or separate, we reverse the court's division of the marital assets and remand for revaluation and redistribution, excluding any cash value for Betty's life insurance policies.

---

[10] Betty urged us to determine that "term" life insurance policies have no cash value as a matter of law. Mississippi courts have not made such a distinction between the types of policies (i.e. whole life versus term life policies) to determine whether a policy has cash value. However, we do not need to decide the question to resolve the issue on appeal.

**II.      Whether the court erroneously awarded Bobby a cash payment of $80,602 and $12,000 for the timeshare.**

¶51.   In its judgment of divorce, the chancery court ordered Betty to pay Bobby $125,000 as a portion of "Betty's savings." The court did not identify the "savings accounts" it considered as "Betty's savings." On her Rule 8.05 financial statement, Betty listed checking, savings, IRA accounts, and an annuity. Her "savings accounts," several of which belonged to Blackhawk Realty, totaled $140,000. To award Bobby $125,000 of this amount would be grossly inequitable, which the chancery court would not intend. The court did not give a reason for choosing the $125,000 figure it required Betty to pay. When Betty moved the court to reconsider the amount, the court lowered the amount, not because of any reconsideration of Betty's savings accounts, but because the court recalculated the value of the rental properties it had awarded to Bobby.

¶52.   On appeal, Betty contends that the chancery court erroneously calculated any cash payment to Bobby, even the reduced amount, as his portion of her savings account. Moreover, she challenges the chancellor's valuation of her savings or retirement accounts. In her motion to reconsider, Betty had provided the court with documentation that several of her "savings" accounts had lower values on the date of demarcation (February 2, 2019) than the values Betty had listed on the Rule 8.05 statement she filed in February 2024. She contends that after the date of demarcation, she alone contributed to the increased value of these accounts, and the increased value was not marital property.

¶53.   First, we note that the chancery court did not clearly describe the marital asset, "Betty's savings," that it was dividing, making it impossible for us to determine if the court

23

abused its discretion in its distribution. We again note that Bobby's "[f]ailure . . . to file a brief is tantamount to confession of error and will be accepted as such unless [we] can say with confidence, after considering the record and [Betty's] brief . . . , that there was no error." *Rogillio*, 101 So. 3d at 153 (¶12). Here, we cannot confidently say there was no error on this issue, and we conclude that we must remand the issues of account identification and valuation. *See Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994) (remanding for reexamination of the entire case is necessary when this Court cannot determine whether the chancellor abused his discretion given the lack of information in the record); *Williams v. Williams*, 303 So. 3d 824, 833 (¶37) (Miss. Ct. App. 2020) (explaining remand is required when we are unable to conduct an appropriate appellate review of a chancellor's asset distribution to determine whether the chancellor abused her discretion).

¶54. On remand, the court should also identify the date of valuation of these "savings accounts." Although the valuation date of marital property is within the chancery court's discretion, *Jenkins v. Jenkins*, 67 So. 3d 5, 14 (¶23) (Miss. Ct. App. 2011), the court should set a date that recognizes one spouse's sole contribution to an account after the date of separation as opposed to natural appreciation of the asset, such as an accrual of interest or a rise in stock value. *See Cossey v. Cossey*, 22 So. 3d 353, 360 (¶30) (Miss. Ct. App. 2009) (holding no error in valuing wife's retirement accounts as of the date of separation when proof established the wife continued to contribute to her retirement after the parties separated); *McDevitt v. Smith*, 127 So. 3d 1156, 1158 (¶5) (Miss. Ct. App. 2013) (holding no error in the court's valuation of investment, retirement, and savings accounts as of the

date of separation when there was insufficient proof showing that the parties had commingled their funds in these accounts after that date). Here, in her motion to reconsider, Betty submitted proof that she did not even open one of her accounts, Ever Bank Checking and Savings, until February 2020, a year after the date of demarcation. Thus, on our record, any money deposited in that account was solely owned by Betty and non-marital. Moreover, the proof showed that the parties never commingled their funds in each other's savings or investment accounts, even while they were married. On remand, the chancery court should include an itemization of all the parties' checking, savings, and retirement accounts, identify the date of valuation, and value those amounts that it finds were part of the marital estate for inclusion in its equitable division of the parties' marital property.

¶55. Concerning the timeshare, the record reflects that it was purchased during the marriage, even if Bobby was the one who paid $12,000 for it. Bobby offered no proof that the funds he used to buy it came from some separate non-marital source. Therefore, it was marital property. If the court awarded the timeshare to either party (rather than ordering it be sold and the proceeds divided), then it would be appropriate for the court to order that the other party be paid one-half of the asset's equity, if any. Given Bobby's failure to contest this issue on appeal, and because we cannot say with confidence that there was no error, we reverse the court's decision that Betty pay Bobby $12,000 for the timeshare and remand for the court to consider the worth of the asset and determine the most equitable method of distributing this asset.

### III. Whether the court erroneously denied Betty any equitable interest in the mortgage-free marital home.

¶56. The chancery court awarded the marital home to Bobby along with all equity in it. Betty contends that the chancery court erred in failing to award her any share of the equity in the home. Other than citing *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994), for the general principle that all property acquired or accumulated during the marriage is presumptively marital property, Betty cites no authority that required the chancery court to award her a share in the equity of the home. Betty cites no legal authority for her argument, and thus, she is procedurally barred from raising this issue. "The failure to cite authority in support of an argument eliminates our obligation to review the issue." *E.H. v. Lee Cnty. Dep't of Child Prot. Servs.*, 420 So. 3d 341, 354 (¶60) (Miss. Ct. App. 2025) (quoting *Glasper v. State*, 914 So. 2d 708, 726 (¶40) (Miss. 2005)).

¶57. Notwithstanding the procedural bar, Betty has not created enough doubt in the judiciousness of the chancery court's decision for us to say with confidence that the chancery court erred in its treatment of the marital home. Although the court correctly considered the marital home as marital property, there is no authority requiring the chancellor to ensure that a spouse receives a portion of the equity. However, upon remand, the court may revisit that award as it revalues the entire marital estate and makes its new equitable distribution.

**IV. Whether the court erroneously double-counted the rental properties Betty had quitclaimed to Bobby in valuing the assets in the marital estate.**

¶58. Betty argues that the chancery court erroneously included in its classification of the parties' property the rental properties Betty had conveyed to Bobby in 2015 by a quitclaim deed. Betty apparently contends that these properties belonged to Bobby and should have

26

been counted as part of his separate estate. Betty cites no legal authority to support her arguments; accordingly, we are not obligated to consider them. Notwithstanding the procedural bar, even in the *Hemsley* case Betty cited, all property acquired or accumulated during a marriage is considered marital property. *Hemsley*, 639 So. 2d at 914. The rental properties Betty quitclaimed to Bobby were acquired during the marriage, and Betty's unilateral transfer of her interest did not change that fact. Betty did not "gift" the property to Bobby;[11] she made her intent clear—she wanted no part of the properties because Bobby had excluded her from any management decisions concerning them. Treating Bobby's failure to file a brief as a confession of Betty's arguments, we find no error by the chancery court in including the rental properties Betty quitclaimed to Bobby as marital property.

## V. Whether the court's distribution of the marital estate was unjustified and inequitable.

¶59. Betty cites several cases that outline the law on equitable division of property in an irreconcilable-differences divorce. These include *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), where the Mississippi Supreme Court identified the three-step process of classifying assets as either marital or non-marital, valuing the marital assets, and then equitably dividing those assets, keeping in mind several factors. *Ferguson* also identified factors that the court can consider in weighing a distribution more favorably toward one party and less favorably toward the other. *Id*. For example, who contributed more to the acquisition of an asset or who may have dissipated marital assets during or after the parties

---

[11] In certain circumstances, personal interspousal gifts may not be marital property. *Ferguson*, 639 So. 2d at 929.

27

separated are such factors. *Id.* Over the years, courts have followed this three-step process, and applied the *Ferguson* factors. *E.g.*, *Warner v. Warner*, 341 So. 3d 152, 159-60 (¶22) (Miss. Ct. App. 2022) ("Under Mississippi law, "[t]o equitably divide property, chancellors must: (1) classify the parties' assets and liabilities as marital or separate, (2) determine the value of the property, and (3) divide the marital property equitably.").

¶60.    In the case at hand, the chancery court erroneously included in the marital estate the two properties that even the court found were purchased by Betty after the date of demarcation, the date on which assets cease to be marital and become separate assets. *Coleman v. Coleman*, 324 So. 3d 1204, 1211 (¶15) (Miss. Ct. App. 2021). Thus, Betty's arguments on appeal create enough doubt in the chancery court's decision that we cannot say with confidence that the decision on the issue should be affirmed. These two properties together had a fair market value of $705,000 and considerable debt. Because they were not part of the marital estate, the chancery court should not have included them in the division of the parties' assets. Nor should the court have included the value of the Mercedes vehicle Betty bought in 2024, years after the date of demarcation.

¶61.    Because we are reversing and remanding this case for the chancery court to reclassify the assets and value them, we need not and, in fact, cannot rule on the overall division of the estate to determine if the court followed *Ferguson*. We note, however, that on remand the court should consider all the assets accumulated during the marriage. For example, Bobby testified that he owned a Chevrolet pickup truck valued at $4,000 that was not included in the court's evaluation. Also, the parties testified that they each had disposed of property

28

during the marriage. (Bobby sold the Nimitz Street property, and Betty sold the Waxwing Drive property). But neither shared the proceeds with the other. The amounts realized from the sales of these properties should also be included in the court's distribution of assets. In addition, the court needs to clarify the date of valuation as it did the date of demarcation to determine whether assets are non-marital or should be valued at a lesser amount.

## CONCLUSION

¶62. We affirm the chancery court's classification of the rental properties that Betty had deeded to Bobby as marital assets because they were purchased during the marriage. Moreover, the chancery court was not required by law to award Betty a portion of the interest in the marital home. However, we reverse the chancery court's order on Betty's motion for reconsideration concerning the cash value of her life insurance policies, the valuations and division of Betty's savings accounts, the payment of the timeshare, and the inclusion of Betty's assets and properties purchased post-demarcation in the marital property division. We reverse the court's overall distribution of marital assets and debts, and we remand for proceedings consistent with this opinion.

¶63. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**

29